**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRESIDIO COMPONENTS, INC., | ) Civil Action No. 07CV893 IEG (NLS) |
| Plaintiff, | ) **CLAIM CONSTRUCTION ORDER** |
| v. | ) |
| AMERICAN TECHNICAL CERAMICS CORPORATION, | ) |
| Defendant. | ) |

Presently before the Court is the construction of disputed terms of the asserted claims of U.S. Patent No. 6,816,356 ("the '356 patent").

**BACKGROUND**

The disputed patent is entitled "Integrated Broadband Ceramic Capacitor Array." A capacitor is a device conventionally comprised of two metal plates separated by a non-conductor of direct electric current. This non-conductive material is known as a "dielectric." Dielectric material includes air or ceramic.

A capacitor is charged by coupling its plates to an electrical source. Since electricity passes easily through the metal plates—which are electrical conductors—but not the dielectric, a positive electrical charge accumulates on one plate and a negative charge accumulates on the other plate. Or, put another way, electrons are introduced on one of the metal plates and electrons are depleted on the

other. When thus charged, the capacitor stores energy which can then be released by connecting the plates via an external path and permitting current to flow from one plate to the other. The electrons will flow off the negatively charged plate and to the positively charged plate, bringing the two plates to equal relative voltage.



PARALLEL PLATE CAPACITOR

Below is an example of a typical "parallel plate capacitor" described above and utilized in the 356 patent. The capacitor is formed by positioning two conductive plates in parallel and separating them by a dielectricic.

One other type of capacitor utilized by the subject patent is a "fringe-effect capacitor." A "fringe-effect capacitor" is formed by positioning the ends of two conductors in an edge-to-edge relationship. Here is an illustration.

FRINGE-EFFECT CAPACITOR

The ability of a capacitor to store charge per unit of voltage applied across its plate is its "capacitance." Capacitance depends on the spacing of the conductive plates and the specific properties of the dielectric material used.

The '356 patent discloses and claims a capacitor consisting of a network of capacitors. The geometry and spacing of the multiple conductive and non-conductive layers of the multilayer capacitor forms multiple parallel-plate capacitors and fringe-effect capacitors.

Below is an embodiment of the capacitor described by the '356 patent. The capacitor contains several conductive plates positioned inside the dielectric body (e.g., structures 10 and 11). The positioning of these plates form parallel plate capacitors. A fringe-effect capacitor is formed in the

-2-

space between 72 and 74.

FIG. 10A

The parties seek construction of numerous limitations contained in the patent's claims. The following chart lists the disputed terms as well as the parties' positions on proposed construction.

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | Substantially Monolithic Dielectric Body | A largely, but not necessarily wholly one-piece dielectric body | A dielectric body largely but not wholly without seams from the inclusion of conductive plates within the dielectric body |
| 2 | A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the first plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive first plate to establish electrical connection |
| 3 | A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the second plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive second plate to establish electrical connection |

| | | | |
|---|---|---|---|
| 4 | The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts which affects the high frequency performance of the capacitor as a whole | An end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |
| 5 | The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect Capacitance with the First Contact. | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts on a second side of the substantially monolithic dielectric body which affects the high frequency performance of the capacitor as a whole | Another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |
| 6 | The dielectric body has a hexahedron shape | The dielectric body has six major surfaces | The substantially monolithic dielectric body has six sides. |

## LEGAL STANDARD

In construing claims, the Court must look first to the language of the claims themselves. Middleton, Inc. v. Minnesota Mining & Mfg. Co., 311 F.3d 1384, 1387 (Fed. Cir. 2002). To that end, "the words of a claim 'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Id. More specifically, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, as of the effective date f the patent application." Id. at 1313.

The specification is "'always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); accord Yoon Ja Kim v. Conagra Foods, Inc., 465 F.3d 1312, 1318 (Fed. Cir. 2006). Phillips invited courts "to rely heavily on the written description [in the specification] for guidance as to the meaning of the claims." 415 F.3d at 1317. For example, the specification may show that the inventor assigned a meaning to a claim term that differs from the claim's ordinary meaning, and, in that case, "the inventor's lexicography governs." Id. at 1316; accord Anderson Corp. v. Fiber Composites, LLC, 474 F.3d 1361

(Fed. Cir. 2007).

Under Federal Circuit precedent, a patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature. On the other hand, a construction that excludes a preferred embodiment is rarely, if ever, correct. C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 865 (Fed Cir. 2004) (internal citations and quotations omitted). The decision whether to limit a claim to the embodiments in the specification "depends in each case on the specificity of the description of the invention and on the prosecution history." Cultor Corp. v. A.E. Staley Mfg. Co., 224 F.3d 1328, 1331 (Fed Cir. 2000). The mere fact that a specification discloses a single embodiment is not enough. Liebel-Flarsheim Co. v. Medrad, 358 F.3d 898, 907 (Fed. Cir. 2004).

The court should rely on extrinsic evidence "[o]nly if a disputed claim term remains ambiguous after analysis of the intrinsic evidence." Pickholtz v. Rainbow Technologies, Inc., 284 F.3d 1365, 1372-73 (Fed. Cir. 2002). Extrinsic evidence is defined as "'all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Phillips, 415 F.3d at 1317 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed Cir. 1995), aff'd 517 U.S. 370 (1996)). Extrinsic evidence is separate from the patent, prepared for litigation purposes, and not necessarily reflective of the perspective of an ordinary person skilled in the art. Id. at 1318. A court must not use extrinsic evidence "to vary, contradict, expand, or limit the claim language from how it is defined, even implicitly, in the specification or [prosecution] history." Dow Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001).

//
//
//
//
//
//
//
//
//

# CLAIM CONSTRUCTION

## I. Disputed Term 1: Substantially Monolithic Dielectric Body

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | Substantially Monolithic Dielectric Body | A largely, but not necessarily wholly one-piece dielectric body | A dielectric body largely but not wholly without seams from the inclusion of conductive plates within the dielectric body |

    i.    Parties' Arguments

Presidio argues this term, "a substantially monolithic dielectric body" should be defined as "a largely, but not necessarily wholly, one piece dielectric body." Presidio relies on lay dictionary definitions for asserting "substantially" means "of ample or considerable amount" and "monolithic" means "consisting of one piece." Presidio explains that this definition captures the idea that the capacitor is not wholly a monolithic dielectric body because conductive structures may be placed on an external surface of the dielectric body, or inside the dielectric body. In support they cite portions of the patent specification which state that a dielectirc body "includes a series of conductive plates arranged in a substantially parallel and opposed configuration in one region of the body" and that "conductive structures may be one or more conductive plates positioned inside the dielectric body . . . . . [Or] the conductive structures may be placed either on an external surface of the dielectric body, or inside the dielectric body . . . ." (the '356 patent, at col. 4, ln. 29-58.)

ATC suggests the claim language, "a substantial monolithic dielectric body," is indefinite or, alternatively, ought to be construed to mean "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body." At the claim construction hearing, ATC presented the testimony of Dr. Joseph P. Dougherty, who explained that a monolithic capacitor is formed by "sintering" (i.e. fusing) together multiple conductive and dielectric layers into a single block and then dipping that structure into a conductive liquid to form conductive contacts. Dr. Dougherty stated that, in his experience, there are no degrees of monolithicness; rather, a capacitor is either monolithic or it is not. As for the term, "substantially monolithic dielectric body," Dr. Dougherty said the term would mean nothing to a skilled artisan. However, in Dr. Doughtery's Rule 4.2 statement,

-6-

he suggests the Court adopt the alternative construction put forth by ATC, explaining that the sintering of conductive plates forms the "seams" mentioned in ATC's construction and it is these seams which makes the dielectric body not entirely (i.e. only substantially) monolithic.  ATC says the concept of seams is understood by skilled artisans based on its use in another Presidio patent to define the meaning of an "essentially" monolithic structure. (ATC's Opening Brief at 12, citing Presidio's U.S. Patent NO. 6,661,639 from a different patent family which states that "[t]he resulting capacitor is a plated, essentially monolithic structure . . . . By essentially we refer to the presence of the internal metallizations that create a partial boundry or seam within the structure . . . .").

    ii.    Analysis

As an initial matter, the Court declines to address ATC's indefiniteness argument at this point with respect to this and other disputed terms and concludes such analysis would be more appropriate at the summary judgment stage.  See Kowalski v. Ocean Duek Corp., 2007 WL 4104259, *3 (D. Hawai'i, November 19, 2007); Intergraph Hardware Technologies Co. v. Toshiba Corp., 508 F.Supp.2d 752, 773 n.3 (N.D. Cal. August 2, 2007); Lisle Corp. v. A.J. Mfg. Co., 289 F.Supp.2d 1048, 1050 (N.D. Ill. 2003) (noting that in the vast majority of cases, claim indefinitness is decided in connection with a summary judgment motion); STX Inc. v. Brine, Inc., 37 F.Supp.2d 740, 754 (D.Md. 1999) (stating that "it would be error to collapse claim construction . . . into a statutory indefiniteness analysis.").

The term "substantially monolithic dielectric body" is not defined in the '356 patent and the Court finds the term remains ambiguous even after examination of specifications, embodiments, and other instrinsic evidence.  Accordingly, the Court finds the use of extrinsic evidence appropriate in construing this disputed phrase.

The Court finds some guidance on how to interpret the disputed term by referencing the use of the term "monolithic" as used to characterize an entire multilayer capacitor structure. For instance, in the '356 patent section titled "Background of the Invention," the concept of monolithic ceramic structure is discussed. ('356 patent, col. 1, 2.) This discussion comes in the context of describing prior art, a structure shown in figure 2A, termed a "multilayer ceramic capacitor." The specification explains that such a structure is formed by stacking layers of a powdered ceramic dielectric material and holding

those layers together by applying an organic binder. After all layers have been stacked and conductive structures are printed on top of various layers to form the desired capacitance, the layers are compressed and diced into capacitors. At this point, the capacitors are heated to drive off the organic binder and fuse the powdered ceramic material into a "monolithic" structure. (Id., at col. 2, ln 12.) Later, in the summary of invention for the '356 patent, it is explained that the disclosed embodiments have "substantially monolithic dielectric body" formed from a plurality of ceramic tape layers laminated together and fired to form a sintered or fused monolithic ceramic structure. (Id., at col. 4, ln 61-65.) The McGraw Hill Dictionary of Scientific and Technical Terms similarly defines a monolithic ceramic capacitor as a "capacitor that consists of thin dielectric layers interleaved with staggered metal-film electrodes . . . compressed and sintered to form a solid monolithic block."

The use of the term "monolithic" in both the background section of the '356 patent and this technical dictionary suggests that, contrary to Presidio's assertion, an experienced artisan would not discount a dielectric body's "monolithicness" based on the presence of conductive plates inside the dielectric. Further, as ATC persuasively argues, the addition of conductive contacts to the exterior of the dielectric body would have no impact on whether the dielectric body itself is monolithic.

Dr. Dougherty testified that the degraded "monolithicness" of the dielectric body referenced by the disputed claim term would be understood by a capacitor designer to refer to seams caused by metal plates protruding out of the dielectric body. Presido's briefing, while stating the extrinsic evidence in general is less reliable than intrinsic evidence, gives no reason to discount Dr. Doughtery's assertion. Presido's reliance on a non-technical dictionary definition to refute Dr. Doughtery, a learned artisan, is unpersuasive.

### iii. Construction

Based on the forgoing, the Court construes the term "substantially monolithic dielectric body" as "a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body."

//
//
//

**II.     Disputed Term 2: A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 2 | A Conductive First Contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the first plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive first plate to establish electrical connection |

The major differences between the parties' construction involves alternative construction for four separate sub-phrases within the disputed term:

>    **i.     the "conductive first contact" is conductive "material" versus a "conductive "layer."**

>              a.     Parties' Arguments

Presidio argues the conductive first contact should be construed as a conductive "material." In support, Presidio cites the summary of invention, which teaches that multiple conductive structures may be formed on the exterior of the capacitor. (See '356 patent, col. 4:52-56 ("conductive structures may be one or more conductive plates positioned inside the dielectric body [or] placed [] on an external surface of the dielectric body . . ."). By envisioning the use of multiple conductive structures, Presidio argues this specification makes clear that the first contact is not necessarily of uniform composition, i.e., a single layer. Precidio asserts that attempting to define the term "contact" to a single structure of uniform construction is an attempt to define the term more precisely than is warranted by the claim.

ATC argues "conductive first contact" should be construed as a "a conductive layer" because the specification does not disclose an instance of a multi-layer contact. ATC cites 37 C.F.R. § 1.84(h)(3) which requires that a "cross section set out . . . all of the materials as they are shown in the view from which the cross section is taken." And which states that "parts in cross section must show proper material(s) by hatching with regularly spaced parallel oblique strokes . . . ." ATC also notes that in every instance in which a "contact" is shown in a cross-section, the contact is shown as having a

uniform composition, i.e., a uniform cross hatching. ATC argues this construction is consistent with the only description in the specification of how contacts are created, which is "dipping" the device in a conductive material ('356 patent, col. 2, lines 13-16). In the alternative, ATC suggests modifying Presidio's construction so that a contact would be defined as "a single conductive material of uniform composition."

### b. Analysis

The summary of invention teaches that conductive structures used in the invention may be one or more conductive plates and explains that such structures may be placed on an external surface of the dielectric body. (col 4, 52-56). The language of the specification includes no limitation that such structures be comprised of only a single layer. Nor does the Court construe the language of 37 C.F.R. 1.84(h)(3) to require that structures hatched in the same manner be of uniform construction. All the regulation directs is that a particular cross-hatch be applied to demonstrate that a particular part or structure exists, not that it must be of "uniform construction." Finally, ATC's reference to the description of how contacts are created is inapposite, as the dipping procedure described therein references prior art. (See '356 patent, col. 2., lines 13-16.) Accordingly, the Court declines to limit the claim language as suggested by ATC and construes "the conductive first contact" as "a conductive material." Because the claim language may be construed by reference to the specification, extrinsic evidence is not appropriate in construing this disputed phrase.

**ii. the contact must be attachable to an external conductor**

### a. Parties Argument

Relying on a alleged admission by Presidio's expert, Dr. Godshalk, ATC asserts the contact would have to be attachable to a conductor to be a useful device.

### b. Analysis

There is no language in the claim term that speaks to any relationship between the conductive first material and an external conductor. Dr. Goldshalk did testify that to make the capacitor a useful device, a conductive structure of the capacitor must attach to an external conductor. However, Dr. Godshalk did not testify that the claim language requires that the conductive first material be attachable to an external conductor. Accordingly, the Court rejects ATC's proposed language.

-10-

### iii. "disposed externally on" means "present on" versus "arranged on"

#### a. Parties Argument

Another difference between the parties' construction of the claim is on the issue of whether "disposed eternally on" (as between the conductive first contact, i.e. 12 in the figure 10A above, and the dielectric body) should be construed as "present on," meaning physically touching, or "arranged on," which would cover an indirect form of connection. ATC notes that the Federal Circuit has stated that "on" means "in physical contact with" in the case Senmed, Inc. v. Richard-Allan Med. Indus., Inc., 888 F.2d 815 (Fed. Cir. 1989) disapproved on other grounds by Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83 (1993). ATC also cites the Federal Circuit's decision which interpreted the phrase "mounted on" denotes a form of attachment, not simply an electrical connection." Asyst Tech. Inc. v. Emtrak, 402 F.3d 1188, 1194 (Fed. Cir. 2005).

Presidio, citing a lay dictionary definition, contends that the definition of "disposed on," is "arranged on." Presidio claims Senmed is inapposite since the court based its decision on evidence that during prosecution of the patent-in-suit, the prosecuting attorney took inconsistent positions. Presumably, argues Presidio, had no prosecution history estoppel been present, the term "on" would have been appropriately defined as not requiring physical contact. Similarly, Presidio argues that the citation to Asyst Tech is also unavailing because the claim term in dispute there was "mounted on" and the context of its use in the specifications made it clear that it was used in those instances to mean securely fixed to objects. Here, the disputed term is "disposed on" which has a broader connotation.

#### b. Analysis

ATC's argument that the Federal Circuit decisions in Senmed and Asyst require "on" be construed as "in physical contact with" is unpersuasive. No language in the specification implies such a requirement. While the embodiments consistently show the contact physically touching the dielectric body, it is improper to rely solely on these embodiments to impose limitations on the claim language. See C.R. Bard, 388 F.3d at 865 (""Under our precedent, a patentee's choice of embodiments can shed light on the intended scope of the claim, but a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature."). Accordingly, the Court construes "disposed externally on" consistent with definition set forth by Presidio as "arranged on."

  **iv. "electrically connected to the first plate" means "having an electrical connection with the first plate" versus "touching the conductive first plate to establish an electrical connection"**

   a. <u>Parties Argument</u>

ATC argues physical touching is required between the contact and the first plate because that is the way that the contact and plate are repeatedly and consistently referenced in the specification and figures.

   b. <u>Analysis</u>

Similar to the Court's conclusion above, while several of the embodiments describe contacts forming a common connection point for each plate extending to that side. (<u>See e.g.</u>, '356 patent, col 6, line 25-28; col. 9, line 46-47), such embodiments do not compel a limitation of the claim language. <u>See</u> <u>C.R. Bard</u>, 388 F.3d at 865. The language simply does not suggest such a requirement Accordingly, the Court construes "electrically connected to the first plate" as "having an electrical connection with the first plate."

  **v. Construction**

Based on the forgoing, the Court construes the term "a conductive first contact disposed externally on the dielectric body and electrically connected to the first plate" as "a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the first plate."

**III. A Conductive Second Contact Disposed externally on the Dielectric Body and Electrically Connected to the Second Plate**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 3 | A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate | A conductive material arranged on an external surface portion of the substantially monolithic dielectric body having an electrical connection with the second plate | A conductive layer for attaching the capacitor (recited in the preamble) to an external conductor, the conductive layer being present on an external surface portion of the substantially monolithic dielectric body and touching the conductive second plate to establish electrical connection |

As the parties conceded, this claim term should be defined consistent with the previous

term. Accordingly, consistent with the reasoning and discussion above, the Court construes the term "a conductive second contact disposed externally on the dielectric body and electrically connected to the second plate" as "a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the second plate."

**IV.   The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|-----------------------------|
| 4 | The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts which affects the high frequency performance of the capacitor as a whole | An end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |

    i.    Parties' Arguments

Presidio asserts the claim term should be defined as "forming a capacitance between or proximate opposed ends of the first and second conductive contacts which affects the high frequency performance of the capacitor as a whole." Presidio explains that the '356 patent solves the high frequency problems of earlier capacitors and cites instances in the specification where the '356 patent mentions that certain fringe capacitance may affect the very high frequency performance of the device. (See e.g., '356 patent, col. 4, ln. 55, 60.)

ATC asserts the disputed term should be interpreted as "an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance." ATC argues its construction is consistent with the plain meaning of the claim and argues Presidio's construction should be rejected since claim 1 does not recite any limitations or effects on high-frequency performance. At the claim construction hearing, Dr. Dougherty testified that the '356 patent does not explain how forming a fringe-effect capacitance would have a measurable effect on the high frequency performance of the capacitor. Further, ATC argues this is an improper functional definition since it is impermissible to define an invention by

"what it does rather than what it is" when no parameters are provided. Halliburton Energy Services, Inc. v. M-I LLC, 514 F.3d 1244, 1255-1256 (Fed. Cir. 2008).

### ii. Analysis

The effect on high frequency performance is not mentioned in claim 1 and nowhere in the specification is the effect on high frequency performance explained. There is simply no justification for introducing the language advanced by Presidio into the construction of the disputed claim term.

### iii. Construction

The Court construes the term "the second contact being located sufficiently close to the first contact to form a first fringe-effect capacitance with the first contact" as "an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

**V. The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect capacitance with the First Contact**

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|------|----------------------------------|------------------------------|
| 5 | The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect capacitance with the First Contact. | Forming a capacitance between or proximate opposed ends of the first and second conductive contacts on a second side of the substantially monolithic dielectric body which affects the high frequency performance of the capacitor as a whole | Another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance. |

As the parties conceded, this claim term should be defined consistent with the previous term. Accordingly, consistent with the reasoning and discussion above Court construes "the second contact being located sufficiently close to the first contact on the second side of the dielectric body to form a second fringe-effect capacitance with the first contact" as "another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance."

## VI. The dielectric body has a hexahedron shape

| # | TERM | PRESIDIO'S PROPOSED CONSTRUCTION | ATC'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 6 | The dielectric body has a hexahedron shape | The dielectric body has six major surfaces | The substantially monolithic dielectric body has six sides. |

### i. Parties' Argument

Presidio proposes the term be defined as "the dielectric body has six major surfaces." Presidio argues that structures that are not hexahedrons were contemplated by the claim term, otherwise the claim language would not include the term "shape." Presidio adds that the majority of the figures in the '356 patent have channels and other features that define more than six sides. (See e.g., Figs. 9a, 10A, 11A, 12A, 20A). Presidio argues it would be impermissible to adopt a construction that would exclude these embodiments.

ATC proposes the following construction: "the substantially monolithic dielectric body has six sides." ATC says hexahedron is a mathematical term which is precise, namely, a three-dimensional object with 6 sides or faces. As such, there should be no room for a definition that calls for six major surfaces with the option for other "minor" surfaces or additional major surfaces. ATC notes that Dr. Godshalk (Plaintiff's expert) admitted that the '356 patent does not disclose an objective standard for determining the difference between "major" and "minor" surfaces.

### ii. Analysis

Where the '356 patent does not teach how to distinguish between a "major" and "minor" surface, the disputed term's use of the term "shape" does not expand the definition of hexahedron to include all objects with six major surfaces. The two dimensional views of dielectric bodies in the embodiments cited by Presidio do not establish an expansion of the claim language. Accordingly, Presidio's proposed construction is rejected.

### iii. Construction

The Court construes the disputed term "the dielectric body has a hexahedron shape" as "the substantially monolithic dielectric body has six sides."

-15-

## CONCLUSION

Having reviewed the amended joint claim chart and the patents-in-suit, the Court **CONSTRUES** the disputed terms as follows:

I. **Substantially Monolithic Dielectric Body**: a dielectric body largely but not wholly without seams from the inclusion of plates within the dielectric body.

II. **A Conductive First contact Disposed Externally on the Dielectric Body and Electrically Connected to the First Plate:** a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the first plate.

III. **A Conductive Second Contact Disposed Externally on the Dielectric Body and Electrically Connected to the Second Plate:** a conductive material arranged on an external surface portion of the substantially monolithic dielectric body and having an electrical connection with the second plate.

IV. **The Second Contact Being Located Sufficiently Close to the First Contact to Form a First Fringe-Effect Capacitance with the First Contact:** an end of the first conductive contact and an end of the second conductive contact are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance.

V. **The Second Contact Being Located Sufficiently Close to the First Contact on the Second Side of the Dielectric Body to Form a Second Fringe-Effect Capacitance with the First Contact**: another end of the first conductive contact and another end of the second conductive contact are present on the second side of the substantially monolithic dielectric body and are positioned in an edge-to-edge relationship in such proximity as to form a determinable capacitance.

VI. **the dielectric body has a hexahedron shape**: the substantially monolithic dielectric body has six sides.

**IT IS SO ORDERED.**

**DATED: June 11, 2008**

_____
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**